PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPHINE GREEN, *et al.*, | ) | |
| | ) | CASE NO. 1:11cv1560 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CGI TECHNOLOGIES AND SOLUTIONS, | ) | |
| *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendants. | ) | **ORDER** [Resolving ECF No. 25] |

This matter is before the Court upon the Motion for Summary Judgment filed by Defendants CGI Technologies and Solutions, and CGI Federal, Inc. ("Defendants").  ECF No. 25.  Plaintiffs Josephine Green ("Green") and Charlotte Camp ("Camp") (collectively "Plaintiffs") responded (ECF No. 26), and Defendants replied (ECF No. 29).  Having considered these pleadings and the applicable law,  the Court grants Defendants' motion, for the reasons that follow.

## I.  Background

### A.  The Claims

Plaintiffs filed an Amended Complaint alleging wrongful termination based upon race discrimination in violation of O.R.C. § 4112.02; wrongful termination in violation of public policy; and intentional infliction of emotional distress.  ECF No. 1-5 at 5-7.  Plaintiffs seek compensatory, consequential and punitive damages as well as attorney fees and costs.  ECF No. 1-5 at 7-8.

(1:11cv1560)

### B. The Parties

Defendants provide IT solutions and business process outsourcing services to a wide array of businesses and federal government agencies.  ECF No. 25-1 at 8.  Such services are provided to the administration of U.S. Department of Housing and Urban Development ("HUD") Section 8 programs and contracts on behalf of state and local housing agencies.  ECF No. 25-1 at 8.  HUD helps apartment owners offer reduced rents to low-income tenants by subsidizing the rent for certain units.[1]  ECF No. 25-1 at 8.

Relevant to this case, HUD contracts with Assisted Housing Services Corporation ("AHSC"), a wholly-owned subsidiary of the Columbus Metropolitan Housing Authority ("CMHA"), to administer Section 8 programs and contracts in Ohio.  ECF No. 25-1 at 8.  AHSC sub-contracts the administration of the Ohio contracts to Defendants.  ECF NO. 25-1 at 8-9.

With regard to the Ohio contract, Defendants ensure that:  Section 8 property owners are in compliance with Section 8 guidelines and regulations; that property owners' contracts with HUD are accurately and timely processed and renewed; and that property owners receive their monthly rent contributions from HUD.  ECF No. 25-1 at 9.

Defendants have two offices in Ohio—Cleveland and Columbus.  ECF No. 25-1 at 9.  Each office has a "portfolio" of site-based Section 8 properties for which its staff provides contract administration services.  ECF No. 25-1 at 9.  The offices are each led by an Area Manager, who is responsible for overseeing all Ohio tasks assigned to her particular office.  ECF No. 25-1 at 9.  The Area Manager supervises three to four Regional Managers, who are assigned

---

[1]  The subsidy is assigned to the rental unit, not the tenant.  ECF No. 25-1 at 8.

(1:11cv1560)

management responsibility for certain portfolios within one or more regions. ECF No. 25-1 at 9. The Regional Managers supervise up to four Central Contract Specialists, who are assigned to specific property contracts. ECF No. 25-1 at 9.

Defendants hired Plaintiff Green as a Regional Manager on August 21, 2000. ECF No. 26 at 6. In September 2005, Green was promoted to Area Manager of the Cleveland office. Green's job included overseeing the processing of rental adjustments associated with contract renewals for Section 8 housing. ECF No. 26 at 6. As an Area Manager, Green reported to the Director of Operations, Tracey Rudy. ECF No. 26 at 6.

Plaintiff Camp was hired by Defendants as a Central Contract Specialist in its Cleveland office on April 21, 2003. ECF No. 26 at 6. Camp was promoted to the position of Regional Manager in October 2005, whereupon she reported directly to Green. ECF No. 26 at 6. Camp was responsible for overseeing all of the activities associated with the Section 8 housing contract renewals as well as overseeing the tasks completed by the Central Contract Specialists associated with those renewals. ECF No. 26 at 6. Rudy also supervised Camp. ECF No. 25-3 at 15.

**C. The CWV Family Housing Project**

In 2009, Defendants' Cleveland office handled a contract renewal for CWV Family Housing ("CWV"). ECF No. 26 at 7. Issues with the CWV renewal first arose because the rent adjustment worksheet, known as iREMS, contained the wrong rent schedules. ECF No. 26 at 7.[2]

---

[2] Though it is not completely clear from the parties' briefs, it appears as though the iREMS database contained standardized rent figures, and what Pope created for the CWV renewal contract was a "budget worksheet" that should correlate with the numbers in the iREMS database. *See, e.g.*, ECF No. 25-3 at 22. In their briefs, Plaintiffs primarily refer to "iREMS adjustment worksheets" while Defendants refer mostly to a "corrupted budget worksheet."

(1:11cv1560)

The rent schedules, allegedly established by HUD, were reviewed by the Central Contract Specialist, Avaughn Pope.  ECF No. 26 at 7.  Pope created a budget worksheet that calculated the rent figures for the CWV renewal.  ECF No. 25-3 at 22.  The budget worksheet turned out to be corrupted, resulting in incorrect figures.  ECF No. 25-2 at 15.

CWV determined that these figures were inaccurate.  They sent an appeal letter in August 2009 to Defendants, which was reviewed and handled by Camp.  ECF No. 26 at 7.  After review of the issue,[3] Camp denied the appeal because it was HUD that made the decisions regarding the rent schedules and Defendants were not in a position to override HUD's decision.[4]  ECF No. 26 at 7.

On September 3, 2009, CWV submitted a second level appeal to HUD.  ECF No. 25-1 at 13.  In its review, HUD evaluated the rent adjustment calculations and identified the mistakes.  ECF No. 25-1 at 13.  Thereafter, HUD sent Rudy an email asking Rudy to look into the matter.  ECF Nos. 25-1 at 13-14; 25-4 at 15.  Rudy investigated the issue and identified the rent schedule

_____

These appear to be two separate items.  The difference between the two worksheets is immaterial to the outcome of the case— the Court simply notes the fact that the parties at least agree that the initial numbers in the CWV renewal contract were miscalculated by Pope.

[3] Defendants allege Camp did not address the basis for the appeal but merely "rubber-stamp[ed]" the denial.  ECF No. 25-1 at 13.

[4] Plaintiffs assert the CWV rent figures were inaccurate because HUD entered 2008 numbers in the database.  ECF Nos. 25-2 at 37; 25-3 at 25.  Defendants allege the problem occurred because the worksheet had been corrupted when Pope downloaded an old worksheet instead of using the proper form.  ECF Nos. 25-1 at 13; 25-2 at 15.  Either way, as noted above, both parties agree the inaccurate rent numbers existed in the budget worksheet and the discrepancy should have been noticed when the CWV renewal contract numbers were calculated.  ECF Nos. 25-2 at 37; 25-3 at 25; 25-4 at 15.

4

(1:11cv1560)

errors and the misuse of the corrupted budget worksheet. ECF No. 25-1 at 14. Rudy convened a conference call with Green, Camp, Pope and another employee, identifying the errors in the CWV contract renewal to date, and giving them specific instructions regarding how to fix the mistakes. ECF Nos. 25-1 at 14; 25-4 at 17; 25-2 at 40; 25-3 at 25. Rudy also gave Green and Camp express instructions to closely monitor the remainder of the contract renewal tasks to ensure a successful and quality completion. ECF Nos. 25-4 at 17; 25-2 at 40. She also directed them to keep her apprised of all activities related to this process. ECF Nos. 25-4 at 17; 25-2 at 40.

On October 5, 2009, Defendants' client CMHA emailed Rudy to express CMHA's dissatisfaction with Defendants' handling of the CWV contract renewal. ECF Nos. 25-4 at 25; 25-6 at 6-7,10. The email stated that CMHA's Executive Director wanted details in writing of Defendants' course of action to remedy the situation and assurance that these issues would not occur again. ECF Nos. 25-4 at 25; 25-6 at 6-7,10. A few days later, Rudy and Vice President Marybeth Carragher met with the CMHA Executive Director, who verbally expressed his dissatisfaction to them. ECF Nos. 25-4 at 25; 25-6 at 6-7,10. Rudy and Carragher shared with him what they were doing to try to bring the CWV contract renewal to a timely and accurate completion. ECF Nos. 25-4 at 25; 25-6 at 6-7,10.

As a result of CWV's second-level appeal, HUD approved a rent increase for the CWV contract. (ECF Nos. 25-2 at 40-41; 25-6 at 11). On October 15, 2009, HUD notified Green of its decision, and Green forwarded the email to Camp. ECF No. 25-2 at 41. Defendants received the new rent schedules from CWV the next day and Camp signed them. ECF Nos. 25-3 at 28; 25-6

5

(1:11cv1560)

at 11.  The rent schedules were to be forwarded to the local HUD office for funding, and the iREMS were to be updated to reflect the correct rent schedules.  ECF Nos. 25-2 at 42; 25-3 at 28; 25-6 at 11.  Plaintiffs failed to complete these tasks or endeavor to discover whether the tasks had been completed.  ECF Nos. 25-2 at 43; 25-3 at 28.  The new rent schedules laid dormant for over a month, until HUD emailed Green on November 19, 2009, and again on November 24, 2009, to inquire into the status of the process.  ECF Nos. 25-2 at 42; 25-3 at 28.  On November 24, 2009, Green responded to HUD, acknowledging that the rent schedules had not been forwarded to the HUD office for funding, but stating that they would be at that time and that iREMS had been updated to reflect the HUD approved rents.  ECF No. 25-2 at 138.  The errors resulted in a loss of revenue equaling $48,017.65.  ECF No. 26 at 9.

In late November, 2009, Rudy, after conferring with her boss Carragher and two others,[5] terminated Plaintiffs.  ECF No. 25-1 at 16.

## II.  Legal Standard

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim upon which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the

---

[5]  In addition to Carragher, Rudy conferred with Nicholas Davalla, the State Manager for Defendants' Ohio Performance Based Contract Administration (ECF No. 26-6 at 1) and human resource consultant Tamara Smith-Caver (ECF No. 25-5 at 5).

(1:11cv1560)

pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely upon its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Id.* In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary

7

(1:11cv1560)

judgment, the non-movant must show sufficient evidence to create a genuine issue of material

fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).  The existence of a mere

scintilla of evidence in support of the non-moving party's position ordinarily will not be

sufficient to defeat a motion for summary judgment.[6]  *Id.*

### III.  Analysis

#### A.  Race Discrimination Claim

##### 1.  *McDonnell Douglas-Burdine* Test

A claim of race discrimination may be proven either with direct or circumstantial

evidence.  *Kline v. Tennessee Valley Auth.*, 128 F.3d 337 (6th Cir. 1997).  When a plaintiff has

not adduced direct evidence of discrimination, as in the instant case, the *McDonnell Douglas-*

*Burdine* burden-shifting analysis applies.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973)*; Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 (1981); *Johnson v. Univ. of*

*Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000).  Pursuant to that analysis, a plaintiff pursuing

discrimination claims under R.C. § 4112 must first satisfy a *prima facie* burden.  *See Williams v.*

*Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999); (case law interpreting Title VII is generally

applicable to cases involving alleged violations of R.C. § 4112 and the same standards apply to

both types of claims); *Plumbers & Steamfitters Joint Apprenticeship Committee v. Ohio Civil*

*Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981) (same).  In order to establish a *prima facie*

---

[6]  Defendants allege that Plaintiffs failed to properly authenticate two documents they
later rely upon in opposition.  ECF No. 29 at 6.  Plaintiffs did not respond to this evidentiary
challenge.  The Court need not decide the issue, however, because it finds that even with the
benefit of the documents, Plaintiffs cannot meet their burden.

(1:11cv1560)

case for racial discrimination, a plaintiff must present circumstantial evidence that: (1) they

belong to a racial minority; (2) they suffered an adverse employment action; (3) they were

qualified for the positions they held; and (4) they were treated less favorably than a similarly

situated employee not in the protected class. *Id*. at 802; *Johnson*, 215 F.3d at 572.

If a plaintiff satisfies her *prima facie* case, the defendant then bears a burden of

production to articulate a non-discriminatory reason for the adverse employment action. *Ladd v.

Grand Trunk Western Railroad, Inc*., 552 F.3d 495, 502 (6th Cir. 2009). Thereafter, the burden

shifts back to the plaintiff to establish that the stated reason was a pretext for discrimination. *Id*.

Another unit of the instant Court explained a plaintiff's pretext burden in such circumstances:

> A reason cannot be proved to be a pretext for discrimination unless it is shown
> both that the reason was false, and that discrimination was the real reason. It is
> not enough, in other words, to disbelieve the employer; the factfinder must believe
> the plaintiff's explanation of intentional discrimination. An employer may make
> employment decisions for a good reason, a bad reason, a reason based on
> erroneous facts, or for no reason at all, as long as its action is not for a
> discriminatory reason.

*Brown v. Renter's Choice, Inc*., 55 F. Supp. 2d 788, 795 (N.D. Ohio 1999) (internal quotations

and citations omitted); *see also Brown v. Packaging Corp. of Am.*, 338 F.3d 586, 593-594 (6th

Cir. 2004) (explaining same).

Therefore, demonstrating pretext is a two-step process. A plaintiff must first prove that

the defendant's explanation for the adverse action (1) has no basis in fact; (2) did not actually

motivate the adverse action; or (3) was insufficient to warrant the action. *Manzer v. Diamond

Shamrock Chemicals, Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). If the plaintiff can establish any

of these elements, she must then go on to show that the defendant's true motivation for the

(1:11cv1560)

adverse employment action included intentional discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Johnson v. UPS*, 117 Fed. App'x. 444, 449 (6th Cir. 2004).

### 2.  Plaintiffs' Prima Facie Burden

The Court first determines whether Plaintiffs have satisfied their *prima facie* burden.  It is undisputed that Plaintiffs meet the first three requirements:  as African-Americans, they belong to a racial minority that constitutes a protected class under Ohio R.C. § 4112.02(A); they were qualified for their positions; and they suffered adverse employment actions in that they were terminated from their employment.

Defendants allege Plaintiffs have failed to satisfy the last element of their burden— that they must present evidence that they were treated differently than other similarly situated Caucasian employees.  ECF No. 29 at 8.  Plaintiffs point to three groups of Caucasian employees that they allege were similarly situated to themselves.  The Court takes each of these in turn.

### a.  DiNapoli and Doner

Plaintiffs allege DiNapoli and Doner, former employees of Defendants, made several mistakes beginning in 2003 that resulted in lost revenue greater than the amount of the lost revenue relevant to Plaintiffs' errors.  ECF No. 26 at 14.  Plaintiffs further allege these mistakes led to client dissatisfaction.  ECF No. 26 at 14.  Defendants argue there is "no competent evidence as to what these mistakes were, who was responsible for them, whether the client was aware of them during the project, or whether they were ignored once discovered."  ECF No. 29 at 10.  Furthermore, Defendants assert DiNapoli and Doner are not similarly situated because they did not share the same supervisor.  ECF No. 29 at 11.

10

(1:11cv1560)

To be similarly situated, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)).  A plaintiff is "required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of the non-minority's employment situation." *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994); *Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000).

 DiNapoli and Doner did not have the same supervisor as Plaintiffs.  Carragher supervised DiNapoli and Doner.  ECF No. 26-7 at 7.  Rudy was Plaintiffs' supervisor and made the decision to terminate them.  ECF Nos. 26 at 8; 25-4 at 23.[7]  Rudy began working for Defendants in 2004; did not supervise any employees until 2005; and she has no knowledge about the circumstances surrounding the errors made by DiNapoli and Doner.  ECF Nos. 29 at 11; 25-4 at 5, 11.

Furthermore, aside from citing lost revenue,[8] Plaintiffs do not establish relevant aspects of their employment situation that were nearly identical to DiNapoli and Doner.  Plaintiffs do not

---

[7] Although the Amended Complaint states that "Rudy, at the direction of Marybeth Carragher, . . . terminated Green and Camp" (ECF No. 1-5 at 3), Plaintiffs later state that "Rudy, by and through the approval of . . . Carragher terminated Green and Camp."  ECF No. 26 at 8-9.

[8] It appears as though lost revenue was a forgone conclusion to many contract renewals. *See e.g.*, ECF No. 27-2 at 13.

(1:11cv1560)

specify what errors occurred; what DiNapoli and Doner did or did not do that may have caused

the errors; whether they received instructions from a supervisor and, if so, how they dealt with

those instructions; nor do they provide sufficient evidence of client dissatisfaction.[9]  Thus,

Plaintiffs do not present sufficient circumstantial evidence that DiNapoli and Doner were

similarly situated to Plaintiffs.

### b.  Uhl and Daroe

Plaintiffs allege that, in 2010, employees Uhl and Daroe "made errors on a contract

renewal virtually identical to the CWV renewal" and were not terminated.  ECF No. 26 at 15.

Uhl, the Area Manager, and Daroe, the Regional Manager, committed errors that led to a loss of

revenue of about $140,000.  ECF No. 27-2 at 13.  However, Plaintiffs were not terminated for

committing errors that led to a revenue loss; rather, Plaintiffs were terminated because of client

---

[9] Plaintiffs allege DiNapli and Doner's actions "led to significant client dissatisfaction"
but fail to elaborate.  ECF No. 26 at 14.  Doner, in her deposition, was asked:

Q:     Was it ever communicated to you that the client was upset with the way this project was
       handled?
A:     On the special claims, yes.  He didn't agree with what I had come up with.
Q:     Did he say that to you directly?
A:     No, I was--
Q:     How was that told to you?
A:     If I remember right, it was either Joyce or Mike at the very beginning.  I'm not sure which
       one.

At that point, Plaintiffs' counsel moves to another issue.  ECF No. 27-4 at 15-16.

The Court notes that "special claims" is something distinct from "rent adjustment issues"
as stated by Doner, though it is not clear what the difference is, as Doner is not asked to
elaborate.  ECF No. 27-4 at 15.  Furthermore, the "client" referred to by Doner is an owner of a
property.  ECF No. 27-4 at 14.  At times, deponents use "client" generally when referring to
owners of rental properties, as did Doner on this occasion.  The term "client," however, is also
used to specifically refer to CMHA, the party that contracts for Defendants' services, as
exemplified in Plaintiffs' client dissatisfaction situation.  ECF Nos. 27-2 at 16; 25-4 at 25.

12

(1:11cv1560)

dissatisfaction and an alleged failure to successfully resolve the CWV renewal despite specific instructions to do so.  ECF Nos. 25-4 at 26-7; 25-2 at 45.  Plaintiffs fail to point out performance deficiencies of Uhl or Daroe during the contract renewal in 2010.[10]  As noted, revenue loss was common in contract renewals.  Without more, Plaintiffs have not provided circumstantial evidence that Uhl and Daroe were subject to the same standards and engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  *See Ercegovich, 154 F.3d at 352*.

### c. Tracey Rudy

Plaintiffs allege that Tracey Rudy had the "exact same" duties as Plaintiffs regarding the contract renewal, and, unlike Plaintiffs, Rudy was not terminated or disciplined.  ECF No. 26 at 18.  However, Rudy was Plaintiffs' supervisor.  ECF No. 26 at 6.  As such, she was not similarly situated to Plaintiffs.  *See Pierce, 40 F.3d at 802* (finding to be without merit the plaintiff's argument that, in the context of similarly situated employees, it is "irrelevant" whether a compared employee is a supervisor); *Rutherford v. Britthaven, Inc., 452 Fed. App'x. 667, 672 (6th Cir. 2011)* (holding that supervisory and non-supervisory employees are not similarly situated); *Carson v. Patterson Co., Inc., 423 Fed. App'x. 510, 513 (6th Cir. 2011)* (explaining that the plaintiff could not be similarly situated to his boss because he "could not 'have dealt with the same supervisor' as [the plaintiff,]" quoting *Mitchell, 964 F.2d at 583*).

---

[10]  Despite Plaintiffs' statement that Daroe's written warning listed "client dissatisfaction" as a reason for the warning (ECF No. 27-2 at 31), Plaintiffs do not indicate what, if any, client dissatisfaction occurred.  Without more elaboration, the written warning on its face appears to be a formulaic recitation of generic employment issues.

13

(1:11cv1560)

Plaintiffs fail to present circumstantial evidence that they were treated less favorably than a similarly situated employee not in the protected class.  As such, Plaintiffs fail to satisfy their *prima facie* burden.  Furthermore, as discussed below, Plaintiffs also fail to meet the additional burden of showing Defendants' stated reason was a pretext for discrimination.

### 3.  Defendants' Non-Discriminatory Reason

Assuming, *arguendo*, that Plaintiffs meet their *prima facie* burden, Defendants would bear the burden of production to articulate its non-discriminatory reason for terminating Plaintiffs.  *See Ladd*, 552 F.3d at 502.  Defendants allege that Plaintiffs failed to successfully manage the CWV contract renewal process and demonstrated an inability or unwillingness to hand-hold the process to completion, after being given strict instructions to do so.  ECF No. 25-1 at 19.  Furthermore, Defendants assert there is no evidence that Plaintiffs' failure to perform was insufficient to warrant their terminations.  ECF No. 25-1 at 19.

### a.  Plaintiff Green

Defendants produce evidence articulating a non-discriminatory reason for terminating Green.  Defendants have shown Green failed to monitor the CWV renewal contract to ensure it was properly completed.  It was not properly completed.  After the initial appeal had been denied by Camp, Rudy asked Green specifically to keep her informed of the CWV project.  ECF No. 25-2 at 39-40.  Green received an email from HUD asking about the second appeal— Green forwarded it to Camp and, after another email from HUD over a month later, affirmed that the document had been sent out.  ECF No. 25-2 at 41-42.  The document, however, had not been sent out.  ECF No. 25-2 at 43.  Thus, Defendants have shown Green failed to monitor the renewal

14

(1:11cv1560)

contract to ensure it was properly completed and failed to keep Rudy informed.

### b.  Plaintiff Camp

Defendants have also produced evidence articulating a non-discriminatory reason for terminating Camp.  Defendants have shown Camp was responsible for determining whether the CWV contract was handled correctly, and that she failed to supervise and monitor Pope's performance.  ECF Nos. 25-1 at 20; 25-3 at 26.  Defendants also show Camp failed to properly review CWV's first level appeal and, after receiving instructions to bring the CWV renewal to a timely and accurate conclusion, Camp failed to ensure the rent schedules were sent to HUD for funding purposes.  ECF Nos. 25-1 at 20; 25-3 at 28.

### c.  Plaintiffs' "Tainted Discrimination" Argument

Plaintiffs allege that their terminations were tainted with discrimination because they were not given an equal opportunity to improve or provided with disciplinary warnings pursuant to Defendants' "Progressive Discipline," with the result that Defendants cannot meet their burden.  ECF No. 26 at 20.  Plaintiffs' argument is misplaced.  Defendants' burden is one of production; Plaintiffs at all times carry the burden of persuasion.  *See Weigel v. Babtist Hosp.*, 302 F.3d 367, 277-78 (6th Cir. 2002); *Burdine*, 450 U.S. at 253.

Furthermore, the cases Plaintiffs rely upon in support of their argument that Defendants do not meet this burden are incongruous with the instant case.  *Guy*, *Cosgrove*, and *Vaughn* all involved allegations that the plaintiff employee's prior performance records were tainted by racial discrimination, and the employers took adverse action based upon those prior incidents. *See Guy v. Central Locating Serv. Inc.*, 389 F.Supp.2d 843, 854 (N.D. Ohio 2005)(use of

15

(1:11cv1560)

employee plaintiff's work performance to determine lay-off was tainted by race-based discrimination in training); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039-1041 (2d Cir. 1993)(employee plaintiff's lack of follow-up counseling, subsequent performance evaluations and early termination were the result of employer's knowledge that employee had filed a sex discrimination claim against it); *Vaughn v. Edel*, 918 F.2d 517, 521-523 (5th Cir. 1990) (employee plaintiff was never criticized or counseled about her poor performance because she was African-American, resulting in a poor performance record).  Plaintiffs in the instant matter do not allege prior performance records were tainted by racial discrimination or that they were never criticized or counseled about their poor performance.  In fact, Rudy notified Plaintiffs of their performance deficiencies and gave instructions about how to cure the problem.  ECF Nos. 25-4 at 17; 25-2 at 40; 25-3 at 25.

Plaintiffs' reliance upon *Holbrook v. LexisNexis*, 862 N.E.2d 892, 898-99 (Ohio App. Ct. 2006) is also misplaced.  *Holbrook* involved an employee misconduct case in which the employer terminated the employee plaintiff because he allegedly intentionally set off a fire alarm. *Id*. at 346.  The court found the decision to terminate was based upon an investigation tainted by racial discrimination as evidenced by the comparable investigation engaged in regarding a similarly situated non-minority co-worker who may have also intentionally set off the fire alarm. *Id*. at 897-99.  In the instant case, as noted, Plaintiffs fail to provide similarly situated co-workers with which to compare treatment, and, in any event, there is no dispute in the record regarding what action or inaction Plaintiffs took regarding the CWV contract renewal.

16

(1:11cv1560)

In sum, the Court finds that Defendants state legitimate, non-discriminatory reasons for terminating Plaintiffs.  These reasons are sufficient to rebut the legal presumption of unlawful discrimination.

### 4.  Plaintiffs' Burden Showing Pretext for Discrimination

Because Defendants succeed in carrying their burden of production, the burden returns to Plaintiffs to dispel Defendants' stated explanation.  *See St. Mary's*, 509 U.S. at 510-11.  Plaintiffs appear to allege Defendants' assertions are pre-textual because these assertions did not actually motivate Defendants' conduct, as evidenced Defendants' failure to accord Plaintiffs with the same "Progressive Discipline" steps that were given to similarly situated non-minority employees according to Defendants' disciplinary system.  ECF No. 26 at 22.  As noted previously, Plaintiffs fail to provide similarly situated employees with which to compare treatment.

Additionally, despite Plaintiffs' assertions, the record does not support the view that Defendants had a policy requiring managers and directors to issue verbal and written warnings before terminating an employee for performance deficiencies.  ECF Nos. 25-4 at 6-8; 27-3 at 23-24; 25-5 at 6-7; 27-1 at 7.  Therefore, the failure to provide progressive discipline to Plaintiffs is not malignant to Defendants' explanation.  *See E.g. Brown v. Renter's Choice, Inc.*, 55 F.Supp. 2d 788, 796 (N.D.Ohio 1999) (finding no evidence that the defendant required a regional manager to use "critical incident sheets" to report complaints or problems); *Singleton v. Select Specialty Hosp.*, 391 Fed. App'x. 395, 404 (6th Cir. 2010) (explaining that progressive discipline policies are only relevant to disparate treatment claims where the employee was discharged pursuant to such a policy); *Crase v. Shasta Beverages, Inc.*, 2012 WL266406, at *5 (Ohio App.

17

(1:11cv1560)

Ct., Jan. 31, 2012) (explaining that if there is no requirement that an employer use a progressive

discipline policy, a failure to subject an employee to the policy is not evidence of a

discriminatory motive).

Plaintiffs next contend that the record reflects that Defendants could not identify an

instance where a manager was terminated for a non-intentional, non-fraudulent act other than

Plaintiffs' termination "raise[s] the inference that [Plaintiffs] were singled out from other []

managers involved in similar[] situations, based on no reason other than their race."  ECF No. 26

at 22.  Plaintiffs do not cite legal authority for this conclusion.  As Defendants argue, it is not

Defendants' burden to prove there were other employees engaged in the same or similar conduct

as Plaintiffs'.  ECF No. 29 at 17.  To require such a production of Defendants would create an

inference of discrimination any time an employer took adverse action against an employee for

performance or misconduct matched by no other employee.  It is Plaintiffs' burden to come

forward with evidence to show that their terminations were motivated by a discriminatory

animus, and not Defendants' burden to offer evidence showing that there were other employees

engaged in the same performance deficiencies as Plaintiffs and that they were treated differently.

Finally, Plaintiffs allege that Carragher approved Plaintiffs' terminations without

conducting an investigation herself.  ECF No. 26 at 22.  However, Carragher relied upon Rudy to

make disciplinary decisions; she knew about the errors regarding the CWV renewal and the client

complaints; and the errors were documented in a memorandum with supporting documentation.

ECF Nos. 29 at 16; 27-3 at 8, 12-13; 25-6 at 7-8.  It is not therefore clear why Plaintiffs argue (1)

Carragher should have conducted her own investigation, or (2) that a failure to do so is an

18

(1:11cv1560)

indication of a discriminatory motive.

Plaintiffs do not meet their burden establishing Defendants' asserted reasons for termination are a pretext for discrimination.  Therefore, Defendants are entitled to summary judgment.

### B.  Public Policy Claim

Plaintiffs assert a public policy claim pursuant to Ohio law for wrongful discharge based upon racial discrimination.  ECF No. 26 at 23.  Defendants contend such a claim is not cognizable because the remedies in R.C. § 4112 provide complete relief for a statutory claim. ECF No. 29 at 17.

"Ohio law does not 'recognize a common-law claim when remedy provisions are an essential part of the statutes on which the plaintiff depends for the public policy claim and when those remedies adequately protect society's interest by discouraging the wrongful conduct.'" *Wakefield v. Children's Hospital*, 2008 WL 3833798, at * 8 (S.D.Ohio, Aug. 13, 2008)(quoting *Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36, 42–43 (Ohio 2007)).  No public policy race discrimination or retaliation claims exist in Ohio because § 4112, with its "full panoply of remedies, including compensatory and punitive damages," adequately protects society's interests. *Id.*; *Carter v. Delaware County Bd. of Com'rs*, 2009 WL 544907, at *13 (S.D.Ohio, Mar. 3, 2009)*; see also* *Rice v. CertainTeed Corp.*, 704 N.E.2d 1217, 1221 (1999); *Barlowe v. AAAA Int'l Driving Sch., Inc.*, 2003 WL 22429543, at *8 (Ohio Ct. App., Oct. 24, 2003) (finding that § 4112 provides "broad relief which is sufficiently comprehensive to vindicate the policy goals set forth in that statute."); *Carrasco v. NOAMTC, Inc.*, 124 Fed. App'x. 297, 304 (6th Cir.2004)

19

(1:11cv1560)

(affirming the dismissal of the plaintiff's retaliation claim in violation of public policy because both Title VII and § 4112 provide adequate remedies to protect society's interests).

Plaintiffs cite *Collins v. Rizkana*, 652 N.E.2d 653 (Ohio 1995) in support of their argument that the Court may entertain the public policy claim despite the duplicated remedies in 4112.02.  ECF No. 26 at 23.  Plaintiffs' argument is not well taken.  *Collins* involved a public policy claim for sexual harassment wherein the public policy arouse from multiple sources and the statutory schemes did not provide adequate remedies.  *Collins*, 652 N.E.2d at 660.  Plaintiffs do not allege their public policy claim arises from multiple sources nor do they claim the statutory remedy is unavailable to them, as was the case in *Collins*.[11]

Plaintiffs do not state a cognizable public policy claim; Defendants are entitled to summary judgment.

### C.  Intentional Infliction of Emotional Distress

Plaintiffs assert an intentional infliction of emotional distress claim.  ECF No. 26 at 23.  Aside from identifying health issues that arose after their terminations, Plaintiffs do not attempt to establish any of the elements of their intentional infliction of emotional distress claim.  The Court declines to engage in this activity on their behalf.  Defendants are entitled to summary judgment.

---

[11] R.C. 4112 was not available to the employee plaintiff in *Collins* because her employer was not included in the scope of "employer" defined in R.C. 4112.01(A)(2) due to the fact that he did not employ four or more persons.  652 N.E.2d at 660.  The court stated that it "cannot interpret R.C. 4112.01(A)(2) as an intent by the General Assembly to grant small businesses in Ohio a license to sexually harass/discriminate against their employees with impunity." *Id.* at 660-61.

(1:11cv1560)

## IV.  Conclusion

For the reasons stated above, the Court grants Defendants' Motion for Summary

Judgment (ECF No. 25) as to all claims.


IT IS SO ORDERED.


  November 28, 2012                          */s/ Benita Y. Pearson*      
Date                                      Benita Y. Pearson
United States District Judge